U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 JUL 14  PM 3: 34

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:13-cr-166 |
| ) | |
| LUIS A. CORDERO ) | |

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
(Doc. 27)

This matter came before the court on June 17, 2014 for an evidentiary hearing on Defendant Luis A. Cordero's motion to suppress evidence. (Doc. 27.) Defendant is charged in a one count indictment with bulk cash smuggling in violation of 31 U.S.C. § 5332(a)(1).

Defendant seeks suppression of physical evidence discovered after U.S. Border Patrol agents searched his vehicle during a traffic stop near the United States-Canadian border. Defendant argues there was no lawful basis for the traffic stop, no basis to extend the stop to permit a canine sniff which Defendant contends was unlawful, and no probable cause to search the vehicle after the canine allegedly alerted. The government opposes the motion, contending the vehicle was properly stopped upon reasonable suspicion of criminal activity, law enforcement did not impermissibly prolong the traffic stop, the canine's alert provided probable cause to search the vehicle, and the canine sniff was not a search.

The government is represented by Assistant United States Attorney Eugenia A. Cowles. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

**I.   Findings of Fact.**

In or about September of 2013, United States Border Patrol agents discovered a new footpath in an area known as "the slash" which straddles the United States-Canadian border in the area of East Richford, Vermont. The slash is a strip of land that has been

cleared of tall vegetation to create a physical demarcation between the two countries. The East Richford Cemetery is in the area of the slash and also straddles the international border. It contains mostly historic tombstones from the 1800s and the early 1900s. Based upon intelligence reports, as of September 2013, Border Patrol agents regarded the East Richford Cemetery as a "hot spot" for illegal entry due to its proximity to the border although there had been no recent arrests.

Border Patrol agents decided to set up a game camera in order to determine whether individuals were using the footpath to illegally enter the United States. On September 17, 2013, at approximately 7:00 a.m., the Border Patrol's game camera captured an image of the legs and feet of two individuals wearing camouflage walking southbound on the footpath towards the United States. In response to this information, the Border Patrol decided to conduct a "lay-in operation" near the East Richford Cemetery in the vicinity of East Slide Road during which Border Patrol agents assumed various positions on the ground and in vehicles in order to apprehend individuals who may be entering the country illegally. The lay-in operation commenced at approximately 4:00 a.m. on September 18, 2013 after Border Patrol agents were briefed that there had been evidence of recent smuggling activity in the area.

Border Patrol Agent Craig Weatherspoon was part of the lay-in operation and was one of three agents on the ground. His position was in the southeast corner of the East Richford Cemetery in the area of the slash. At approximately 6:00 a.m., he heard a branch snap which he believed was someone coming up the footpath from Canada. Thereafter, he noticed a maroon pick-up truck travelling west on a dirt path in the cemetery. The truck stopped and parked on the Canadian side of the border at the end of the dirt path. An individual, who was later identified as Defendant, exited the truck. After he did so, Agent Weatherspoon told Defendant that the Border Patrol agents were conducting surveillance in the area and asked Defendant what he was doing. Defendant responded that he was visiting a friend's tombstone. At the time of this conversation, Defendant was in Canada and Agent Weatherspoon was in the United States. Agent Weatherspoon asked Defendant: "Can you come down to the road?" and Defendant did

so. Agent Weatherspoon asked if Defendant had any weapons on him and Defendant lifted up his jacket to indicate he did not. Agent Weatherspoon asked for identification and Defendant provided an identification card and stated that he had recently moved to the area of Slide Road and he repeated that he was visiting a friend's tombstone. Defendant's truck was parked away from the majority of the tombstones and close to two older stones. When the conversation ended, Defendant did not go into the cemetery but, instead, returned to his truck and drove away. Because Defendant was in Canada, Agent Weatherspoon decided to take no further action other than to tell the other agents on foot that he had encountered Luis Cordero in the cemetery. Border Patrol Agent William Hafley radioed this information to the mobile units participating in the lay-in operation.

As part of the lay-in operation, Supervisory Border Patrol Agent Aaron Porter was in a marked Border Patrol vehicle on Johnson Road. He heard a dispatch regarding the Border Patrol's encounter with Defendant in the East Richford Cemetery. He recognized Defendant's name as one associated with someone who had been encountered on Slide Road in a suspicious manner but who had not been arrested. He did not hear any details regarding Agent Weatherspoon's encounter with Defendant in the cemetery as the radio transmission was spotty. Border Patrol Agent Brian Dike, who was in a Border Patrol vehicle located on Slide Road, radioed that he had seen a vehicle travelling westbound on Slide Road.

Agent Porter repositioned his vehicle and first heard and then saw a vehicle travelling at a high rate of speed. At approximately 6:15 or 6:20 a.m., the vehicle passed Agent Porter's position with no illuminated headlights. At the time, it was still dark outside and there were patches of fog rising from a nearby river. Agent Porter turned on his vehicle's headlights and tried to get a good look at the vehicle's operator. As soon as his lights were illuminated, the vehicle turned sharply onto Johnson Road which is generally used by local traffic to access Route 105. Agent Porter followed the vehicle and radioed the license plate number to dispatch, which ran the plate number and determined it was "not in the file" which he interpreted as indicating the vehicle was unregistered. Agent Porter followed the vehicle for approximately five minutes looking

for a safe location to conduct a traffic stop. En route, he radioed for back-up for officer safety purposes.

After Defendant turned east on Route 105, which revealed Defendant's path of travel was circuitous and inconsistent with local traffic patterns, Agent Porter effected a traffic stop by activating his vehicle's emergency lights. Both he and Agent Dike approached Defendant's vehicle which was an older maroon Ford pick-up truck. Defendant was the operator of the vehicle and there were no passengers. Agent Porter asked Defendant if he was a U.S. citizen and Defendant stated that he was and that he was born in the United States. Agent Porter asked Defendant for identification and Defendant produced an identification card that indicated a post office box in Richford, Vermont as his address. Defendant stated that he lived at 89 East Slide Road and that he was the owner of the vehicle and had recently purchased it. Agent Porter asked Defendant for his operator's license and Defendant stated he had lost it. Agent Porter asked Defendant if he had any proof that he was the owner of the vehicle and lived on East Slide Road. Defendant responded that he lived at 69 East Slide Road. Agent Porter confronted Defendant with the apparent discrepancy and Defendant stated that "it was always 69 Slide Road." Agent Porter asked Defendant if he had any drugs or weapons and Defendant responded in the negative.

Agent Porter noticed that the interior of the truck was fairly clean and contained no personal possessions and that the key ring had only one key on it. He interpreted this as indicia that Defendant may not own the truck. He examined the truck's tailgate which was locked and appeared to have been recently closed because while there was dust on the remainder of the tailgate, it looked like a handprint had been wiped off where the tailgate had been closed. There was a tonneau cover over the bed of the truck and Agent Porter asked if he could search that area. Defendant responded that there was no need to search it. Agent Porter explained that Defendant was driving with his lights out, could not prove he lived in the area, could not establish that it was his vehicle, and that a search would only take a few minutes. Agent Porter stated he would call a canine unit in the absence of consent. Defendant replied that he would be willing to wait for a canine. The

4

canine unit arrived approximately fifteen to twenty minutes later and approximately thirty minutes after the initiation of the traffic stop.

While the agents awaited the canine unit, Agent Dike asked Defendant if he had ever been arrested before, "ran" Defendant's identification, and asked Defendant about some prior criminal history. The nature of this criminal history is not in evidence.

Upon the arrival of the canine unit, the agents briefed the canine handler, Border Patrol Agent Adam Birchand, about the nature of their investigation. Agent Birchand asked Defendant if he would step out of the vehicle during the canine sniff. He made this request for Defendant's safety as well as for officer safety and to avoid any altercation with the canine. Defendant agreed to do so. Agent Birchand noticed the truck's interior was clean and without personal belongings and that the dusty tailgate appeared to have been wiped clean where it had been closed. He noticed that the tonneau cover did not fit the truck's bed.

When Agent Birchand retrieved Chieko, a German Shepard, from his vehicle and approached the truck, Chieko immediately began to alert. While Agent Birchand and Chieko circled the perimeter of the truck, Agent Porter and Defendant waited in front of the truck from which vantage point Agent Porter could only partially observe Agent Birchand and Chieko. When Chieko alerted to the tailgate of the truck, Agent Birchand placed his hand upon it and Chieko confirmed the alert. Agent Birchand approached the front of the vehicle. Agent Porter recalls Agent Birchand telling him to put Defendant "on the ground" meaning to tell Defendant to sit down on the ground so that he posed a lesser danger to officer safety. Agent Porter understood this instruction to mean the canine had alerted. In contrast, Agent Birchand does not recall saying anything to Agent Porter. He credibly testified that he approached the front of the vehicle, told Defendant the canine had alerted, and asked for Defendant's consent to a search which Defendant denied. Both Agent Porter and Agent Birchand credibly testified that Defendant questioned how the canine had alerted, and asked to see the alert.

Agent Birchand returned to the tailgate and opened it using a key Agent Dike had retrieved. In the back of the truck were bags of fertilizer and a camouflage duffle bag

5

containing $400,000 in U.S. currency packaged in plastic bags. Defendant was placed under arrest and handcuffed, but was not given *Miranda* warnings. As Defendant was escorted past the truck's tailgate he said to Agent Birchand: "Good job officer. Good job."

Thereafter, at the Richford Border Patrol Station, Agent Birchand performed a controlled test on Chieko's alert. This consisted of a canine instructor placing two rows of empty containers and asking Agent Birchand to run Chieko by them. Agent Birchand did so and Chieko did not alert. He and Chieko then left the room and the canine instructor placed a plastic bag of some of the seized currency in one of the containers. Agent Birchand and Chieko returned to the room and walked past the two rows of containers and Chieko alerted to the container which held the currency.

Both Agent Birchand and Chieko have been certified as a detection team initially in September of 2012 and again on October 3, 2013. In addition, Chieko has received bi-weekly maintenance training since his initial certification. Agent Birchand does not keep track of Chieko's false negative and false positive alerts and does not believe these records are maintained.

## II. Conclusions of Law and Analysis.

### A. Whether the Traffic Stop Was Based Upon a Reasonable Suspicion of Criminal Activity.

In seeking suppression, Defendant first argues that the initial stop of his vehicle was not supported by a reasonable suspicion of criminal activity. Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (internal quotation marks omitted). An officer must have "a 'particularized and objective basis' for suspecting legal wrongdoing" at the inception of the stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "While the officer may not rely on an inchoate and unparticularized suspicion or hunch, he is entitled to draw on his own experience and specialized training to make

inferences from and deductions about the cumulative information available to him that might well elude an untrained person." *Padilla*, 548 F.3d at 187 (internal citations, quotation marks, and brackets omitted). "[I]n assessing reasonable suspicion, the court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal quotation marks omitted).

When considering whether a Border Patrol stop is supported by reasonable suspicion, the Second Circuit has instructed courts to consider the following factors:

> (1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress.

*United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005).

In this case, all but the final *Singh* factor supports a finding that Agent Porter's traffic stop of Defendant's truck was based on reasonable suspicion. The Border Patrol had established surveillance in response to a new footpath and captured images of unlawful border-crossing activity near the East Richford Cemetery, a known "hot spot" for illegal activity. The next morning, agents encountered Defendant in the cemetery with a dubious explanation for his presence there which he did not act on because, rather than visiting a tombstone, he returned to his truck after his encounter with Agent Weatherspoon. Information regarding Agent Weatherspoon's encounter with Defendant in the East Richford Cemetery was relayed to Agent Porter,[1] who recognized Defendant as being associated with prior suspicious activity on Slide Road. *See United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (finding that defendant's close

---

[1] Although Agent Porter did not know the details of Agent Weatherspoon's encounter with Defendant in the cemetery, the determination of whether reasonable suspicion exists "'can be based on the collective knowledge of all of the officers involved in the surveillance efforts' so long as 'the various law enforcement officers in th[e] investigation were in communication with each other.'" *United States v. Garcia*, 413 F.3d 201, 213 (2d Cir. 2005) (quoting *United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987)).

7

proximity to the border "shortly after receiving reports" of suspected smuggling activity, among other factors, gave rise to a reasonable suspicion of criminal activity).

After Defendant left the East Richford Cemetery, Agent Porter was notified that Defendant was headed towards his location and observed Defendant traveling at a high rate of speed without any headlights, despite the poor visibility during the early morning hours. Vermont law requires a vehicle's head lights to be illuminated "from 30 minutes after sunset to 30 minutes before sunrise" when operating on a public highway. 23 V.S.A. § 1243(b). When Agent Porter illuminated his own headlights, Defendant turned abruptly onto Johnson Road, thereby taking evasive action. When Defendant turned on to Route 105 heading east, his path of travel became indirect and circuitous which was further evidence of potential evasion. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (holding that "obvious attempts to evade officers can support a reasonable suspicion"). As Agent Porter followed Defendant's vehicle, he contacted dispatch and discovered that Defendant's vehicle may not have been registered.

Examining the totality of the circumstances "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (citation omitted), there was a reasonable, articulate basis for suspecting Defendant was engaged in smuggling activity at the border prior to the traffic stop. Defendant's motion to suppress on the grounds of an unlawful traffic stop is therefore DENIED.

### B. Whether the Agents Unreasonably Expanded the Legitimate Scope of the Traffic Stop.

Defendant next contends that the agents impermissibly prolonged the vehicle stop by waiting approximately fifteen to twenty minutes for the canine unit to arrive. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992) ("If an investigative stop based on reasonable suspicion continues

too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause.").

"In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Bailey*, 743 F.3d at 336 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Use of a narcotics canine, "during a lawful traffic stop, generally does not implicate" the Fourth Amendment as long as the officers do not "unreasonably prolong[]" the stop. *Caballes*, 543 U.S. at 407, 409.

During the traffic stop in this case, Border Patrol agents discovered that Defendant could not produce an operator's license, any proof of his ownership of the truck, or any evidence that he lived on East Slide Road. *See United States v. Duenas-Rosales*, 2002 WL 1791888, at *3 (D. Neb. Aug. 5, 2002) (holding that the failure of the defendant driver to have a driver's license when stopped for a traffic offense was a factor that contributed to a reasonable suspicion of criminal activity). His inconsistent statements regarding the street number of his residence on East Slide Road caused the agents to suspect that the information Defendant was providing to them may not be truthful. *See United States v. Wallace*, 429 F.3d 969, 976 (10th Cir. 2005) (finding that "inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion") (internal quotation marks omitted).

Because the truck was relatively clean and bereft of personal possessions, the agents suspected that Defendant may not own it and may be providing false information regarding its origin. *See United States v. Wisniewski*, 358 F. Supp. 2d 1074, 1090 (D. Utah 2005) (observing that it is "common for drug couriers to employ third-party vehicles to transport their drugs"), *aff'd* 192 F. App'x 749 (10th Cir. 2006). They considered the single key on the key ring as further evidence of this possibility. *See United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (observing that "a single key on [a] key ring" can be indicative of drug trafficking activity); *United States v. Guerrero*, 472 F.3d 784, 788 (10th Cir. 2007) (finding that a "lone key on a single ring . . .

9

indicated, however weakly, that this was not a car that [the defendant] drove regularly" and thus was consistent with other "more specific, suspicious factors" indicating that defendant was "hauling drugs"). They also suspected that someone had wiped a handprint off the otherwise dusty tailgate when it had recently been closed. Accordingly, there appeared to be an attempt to conceal a recent opening of the truck's locked tailgate.

The agents knew that Defendant had recently been encountered in a "hot spot" for illegal entries into the United States and in an area in which their surveillance indicated a very recent illegal entry into the United States by two individuals wearing camouflage. The foregoing facts "enhanced suspicions of [Defendant's] criminal activities." *Bailey*, 743 F.3d at 337; *see also United States v. Bowman*, 660 F.3d 338, 344 (8th Cir. 2011) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered.") (internal quotation marks omitted).

When Defendant declined to consent to a search of the vehicle, the agents called a canine unit for which Defendant indicated that he was willing to wait. The canine unit arrived approximately fifteen to twenty minutes thereafter. The Second Circuit has held that detaining a suspect in a bus terminal security office "for approximately thirty minutes with his bags to conduct brief questioning and to await the arrival of [a] narcotics dog was a limited intrusion" and thus did not exceed the bounds of a permissible *Terry* stop. *Glover*, 957 F.2d at 1013; *see also United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (holding that five to six minutes of questioning during a traffic stop was permissible and citing with approval other circuit court decisions tolerating "[l]onger intervals," including fourteen- and seventeen-minute delays).

Because Defendant's detention during the traffic stop to await a canine unit was relatively brief and was supported by a reasonable suspicion of criminal activity and because the agents "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly," *Sharpe*, 470 U.S. at 686, the traffic stop was not unlawfully prolonged in violation of the Fourth Amendment. Defendant's motion to suppress on this basis is therefore DENIED.

### C. Whether the Canine's "Alert" Provided Probable Cause to Search the Vehicle.

Although Defendant acknowledges that a canine alert may establish probable cause to search, he points out that he is entitled to contest the reliability of the canine sniff. *See Florida v. Harris*, 133 S. Ct. 1050, 1057-58 (2013) (finding a dog's alert can provide probable cause to search but holding that the defendant "must have an opportunity to challenge . . . evidence of a dog's reliability," whether by (1) "cross-examining the testifying officer," (2) "introducing his own fact or expert witnesses," (3) contesting "the adequacy of a certification or training program," or (4) inquiring whether "circumstances surrounding a particular alert may undermine the case for probable cause"). The *Harris* Court explained that, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 1057. When, as here, a defendant challenges "the reliability of the dog overall or of a particular alert," the court should "weigh the competing evidence" to determine whether the "facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 1058.

In this case, Chieko and Agent Birchand were certified as a canine team in 2012. Chieko is trained to detect drugs and concealed humans. Since certification, Chieko received narcotics-detection training on a bi-weekly basis. Agent Birchand is trained to recognize when Chieko alerts. Chieko and Agent Birchand successfully renewed their certification in October 2013. While Chieko's false negative and false positive alerts in the field are not tracked, the *Harris* Court instructed that such field records "have relatively limited import" in determining a canine's reliability in most cases because "[e]rrors may abound in such records." *Id.* at 1056.

Here, Chieko's alert to the currency in the truck's bed was confirmed by a controlled, blind test at the Richford Border Patrol Station after the traffic stop. Although not required, this test further supports the reliability of Chieko's alert.

11

In summary, Defendant has not identified any evidence that calls into question Chieko's reliability. To the extent Defendant disputes whether Chieko actually alerted to his vehicle, he did not present any evidence to contradict Agent Birchand's credible testimony that Chieko alerted to the tailgate of the truck which Agent Birchand subsequently confirmed by touching his hand to the tailgate which prompted another alert. *See id.* at 1056 & n.2 (noting that "if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all" because "the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person" and explaining that a "detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone"); *United States v. Manning*, 2013 WL 3820022, at *12 (E.D. Tenn. July 24, 2013) (finding probable cause supported search of a package for drugs and currency following canine alert because drug-detection canines are trained to "alert to items, such as currency, that have absorbed the odor of narcotics").

Because Chieko's certification and ongoing training establish his "reliability in detecting drugs and [Defendant has] failed to undermine that showing," Agent Birchand had "probable cause to search [Defendant's] truck" based upon Chieko's positive alert. *Harris*, 133 S. Ct. at 1059. Accordingly, Defendant's motion to suppress on the basis of lack of probable cause for the search is DENIED.

### D. Whether the Canine Sniff of Defendant's Vehicle Constituted a Search for Purposes of the Fourth Amendment.

Defendant contends that law enforcement performed a warrantless search of his vehicle by circling Chieko around it and instructing him to sniff the exterior. While Defendant acknowledges the Supreme Court's holding in *Caballes* that a canine sniff of a vehicle during a traffic stop does not constitute a "search" under the Fourth Amendment, *see Caballes*, 543 U.S. at 409, he nevertheless asserts that the Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013) "has called *Caballes* into question." (Doc. 27 at 5.)

Prior to *Jardines* and *United States v. Jones*, 132 S. Ct. 945 (2012), the Supreme Court held that "the State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *New York v. Class*, 475 U.S. 106, 112 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). In *Jones*, however, the Court explained that *Katz* is not the "*exclusive* test." *Jones*, 132 S. Ct. at 953. Rather, "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 952. Thus, post-*Jones*, a "search occurs when the [g]overnment acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 2014 WL 2722618, at *6 (2d Cir. June 17, 2014) (quoting *Jardines*, 133 S. Ct. at 1414).

In *Jardines*, the Court held that a canine sniff which took place on the front porch of the defendant's home constituted a "search" for purposes of the Fourth Amendment because law enforcement "physically intrud[ed] on" a protected area—the curtilage of the home—to gather evidence. *Jardines*, 133 S. Ct. at 1417. The Court explained that permitting law enforcement to "trawl for evidence with impunity" in an area "where privacy expectations are most heightened" would "significantly diminish[]" the "very core" of the Fourth Amendment, which is the right of a person "to retreat into [his or her] own home and there be free from unreasonable governmental intrusion." *Id.* at 1414-15 (internal quotation marks omitted). Because the canine sniff constituted a search under *Jones*, the Court did not reach the question of whether the sniff also violated the defendant's "expectation of privacy under *Katz*." *Id.* at 1417. "That the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence [was] enough to establish that a search occurred." *Id.*

*Jardines* did not reverse the Court's decisions holding that canine sniffs during traffic stops do not implicate the Fourth Amendment because, unlike the curtilage of one's home, there is no heightened expectation of privacy in one's vehicle. *See Caballes*,

543 U.S. at 409 (finding that "the use of a well-trained narcotics-detection dog" during a lawful traffic stop "does not rise to the level of a constitutionally cognizable infringement"); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (explaining that "an exterior sniff of an automobile" is not a search, in part, because it "does not require entry into the car"); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (noting that *Caballes* "held that a dog sniff performed during a traffic stop does not violate the Fourth Amendment"). The courts that have considered a canine sniff at a traffic stop post-*Jardines* have reached this same conclusion. *See, e.g., United States v. Seybels*, 526 F. App'x 857, 859 n.1 (10th Cir. 2013) (explaining that the holding in *Jardines*, "that entry onto a home's curtilage to conduct a dog sniff is a search, was based on property rights not implicated in the traffic stop context and, hence, did not undermine *Caballes*"); *United States v. Taylor*, 979 F. Supp. 2d 865, 881-82 (S.D. Ind. 2013) (finding that nothing in *Jardines* "disturbed [the] well-settled proposition" that a "dog sniff [is] not a Fourth Amendment search" when "conducted by law enforcement from an area they have a legal right to be"); *Leftridge v. Matthews*, 2013 WL 5467724, at *14 n.14 (D. Md. Sept. 30, 2013) (holding *Caballes* rather than *Jardines* governs the constitutionality of "a sniff of the exterior of a vehicle during a lawful traffic stop"), *aff'd sub nom. Leftridge v. Doe*, 2014 WL 1364002 (4th Cir. Apr. 8, 2014); *but see United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (noting that post-*Jones* and *Jardines*, "it is conceivable that by directing the drug dog to touch the truck and toolbox in order to gather sensory information about what was inside, the border patrol agent committed an unconstitutional trespass or physical intrusion" but explaining that "we need not decide whether it violated or even implicated the Fourth Amendment when agents directed the dog to touch [the defendant's] vehicle because, as the government correctly observes, not every constitutional violation leads to application of the exclusionary rule—a 'judicially created remedy' the only purpose of which 'is to deter future Fourth Amendment violations'") (citation omitted).

Post-*Jardines*, "to the extent that there has been any deviation from the basic principles of . . . *Caballes*—that a dog sniff and positive alert for narcotics is not a

search—it has only been in the context of the uniquely heightened privacy interests implicated in the sanctity of a residential home." *United States v. Parrilla*, 2014 WL 2111680, at *8 (S.D.N.Y. May 13, 2014). There is thus no basis in this case for applying the exclusionary rule to evidence obtained as a result of a canine sniff of a lawfully stopped motor vehicle. Defendant's motion to suppress evidence on the ground that the canine sniff of the truck was an unconstitutional search is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress evidence. (Doc. 27.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 14th day of July, 2014.

Christina Reiss, Chief Judge
United States District Court